# United States District Court
## Middle District of Florida
### Orlando Division

JACQUELINE FERGUSON,

        **Plaintiff,**

-vs-                         **Case No.  6:05-cv-1261-Orl-KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

_____

## Order

      This cause came on for consideration without oral argument on the Complaint

filed by Jacqueline Ferguson seeking review of the final decision of the Commissioner of

Social Security denying her claim for social security benefits.  Doc. No. 1.  The

Commissioner answered the Complaint and filed a certified copy of the record before the

Social Security Administration (SSA).  Doc. No. 9.  Pursuant to the consent of the

parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).

Doc. No. 12.

## I.    PROCEDURAL  HISTORY.

      In January 2003, Ferguson applied for disability benefits under the Supplemental

Security for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq*.

(sometimes referred to herein as the Act).  R. 51-54.  The application alleged that

Ferguson became disabled on July 1, 2002.  *Id.*  Ferguson's application was denied initially and on reconsideration. R. 41-42, 36-38.

Ferguson made a timely request for a hearing before an administrative law judge (ALJ).  R. 35.  An ALJ held a hearing on September 29, 2004.  R. 157-68.  Ferguson, represented by a person who was not an attorney, testified at the hearing.  No other testimony was taken.

After considering the testimony and the medical evidence presented, the ALJ concluded that Ferguson had not engaged in substantial gainful activity since the alleged onset date of her disability. R. 22.

The ALJ concluded that the medical evidence showed that Ferguson had diabetes mellitus type II, history of glaucoma, migraine headaches, back pain, hepatitis C, eczema, and asthma, all of which were severe impairments.  However, the ALJ concluded that these impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1] *Id.*

The ALJ concluded that Ferguson had "impairments that limit her activities with heavy lifting.  However, the clinical findings resulting from these impairments do not appear to . . . produc[e] pain or limitations of incapacitating proportions." R. 21.  The ALJ found that Ferguson had the residual functional capacity (RFC) to stand, walk, and sit six

---

[1]    The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

hours in an eight-hour work day, and to lift up to fifty pounds. *Id.* The ALJ concluded that with this RFC, Ferguson could perform her past relevant work as a bank clerk, security officer, clerical worker, or receptionist, both as she described the positions and as described in the *Dictionary of Occupational Titles. Id.*

In reaching this conclusion, the ALJ gave little weight to the opinion of Dr. Francisco Chebly, one of Ferguson's treating physicians.  The ALJ specifically concluded that Dr. Chebly's opinion that Ferguson was totally disabled was inconsistent with other objective medical evidence and Dr. Chebly's own progress notes.  R. 21. Instead, the ALJ relied on the opinions of consulting and reviewing physicians.  R.  20-21.

The ALJ also found that Ferguson's testimony about the limitations arising from her impairments was not totally credible because her "allegations and subjective symptoms [go] beyond what could be expected considering the objective laboratory and clinical findings," and because there was evidence that Ferguson could care for her personal needs, perform household chores, do laundry, cook simple meals, watch television, and go to the grocery store.  He also observed that physical examinations were within normal limits and that Ferguson reported feeling okay, without significant side effects from medication. R. 21.

Based on the conclusion that Ferguson could return to her past relevant work, the ALJ concluded that Ferguson was not disabled for purposes of the Act.  R. 22.

Ferguson requested review of the ALJ's decision. R. 12.  She also submitted additional treatment records from Dr. Chebly.  R. 8-9.  On July 1, 2005, after review of

the additional records, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 4-6.  Ferguson timely sought review by this Court.  Doc. No. 1.

## II.    JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Ferguson's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1988); 20 C.F.R. § 416.1481.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.   STATEMENT OF FACTS.

*A.    Evidence from Ferguson.*

Ferguson was born January 21, 1951.  R. 159.  She is 5'11" tall, and weighed 273 pounds at the time of her hearing.  R. 159.  She completed eighth grade, and then completed a general equivalency degree.  R. 160.  She did not receive any subsequent vocational training.  *Id.*

Ferguson had worked as a collections agent for a bank, a customer service representative, and as a security officer.  R. 57-58, 67-74, 160.  She also had some experience as an automobile mechanic.  R. 160-61.

In an average day in her first job as a security officer, Ferguson walked for up to eight hours, climbed for up to one hour, wrote, typed or handled small objects for an hour, and lifted up to ten pounds.  R. 58.  In an average day at another security officer position, she sat for seven hours, walked for one hour, reached for one hour, wrote, typed, or handled small objects for two hours, and lifted up to ten pounds.  R. 73.  In an average day at another security/receptionist position, she walked for two hours, stood for

two hours, sat for an hour, climbed for three hours, wrote, typed or handled small objects for two hours, and lifted less than ten pounds.  R. 69.

In an average day as a customer service representative, Ferguson sat for seven-and-a-half hours, reached for seven-and-a-half hours, and wrote, typed or handled small objects for seven and one-half hours, and lifted less than ten pounds.  R. 70.  In an average day as a collections agent, Ferguson sat for seven hours, walked and stood for thirty minutes each, reached for seven hours, wrote, typed or handled small objects for seven hours, and lifted less than ten pounds.  R. 71.

In an average day as a security officer for a bank, she stood for six hours, sat for two hours, reached for three hours, and wrote, typed or handled small objects for four hours, and lifted less than ten pounds.  R. 72.  In an average day as a security officer for a retailer, she walked for one hour, sat for seven hours, reached for one hour, wrote, typed or handled small objects for two hours, and lifted less than ten pounds.  R. 73.

Ferguson stopped working in December 1994 for nonmedical reasons.  R. 57.

Ferguson had type II diabetes mellitus. She did not use insulin, but did use Glucophage,[2] which caused her to experience nausea and diarrhea.  R. 163.  She routinely checked her blood sugar level, and testified that her diabetes was not well controlled.[3]  R. 161-62. She experienced neuropathy[4] in her feet and hands. The

---

[2]     Glucophage is the brand-name for metformin, a drug prescribed to regulate blood sugar. MEDLINE PLUS, *Metformin (Systemic)*, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202756.html (last visited August 31, 2006).

[3]     Ferguson testified that her blood sugar was typically between 170 and 200. R. 161.  A healthy blood sugar level generally ranges between 80 mg/dL (milligrams per deci-litre) before eating and 180 mg/dL after eating.  However, a healthy range varies

neuropathy made her feet and ankles itch, burn, and feel alternatively hot and cold, and caused pain in her toenails.  R. 80, 162.  It also caused pinprick pain in her fingertips.  R. 162.

Ferguson experienced migraine headaches about twice a month, which lasted for several days at a time.  R. 161-62.[5]  She also stated having had stroke-like symptoms and three incidents of temporary vision loss due to migraines. R. 80.

Ferguson had chronic lower back pain.  R. 161.  She denied having had birth surgery, a hysterectomy, or back surgery.  R. 163.

Ferguson had glaucoma, which made her vision blurry.  She did not drive because of blurred vision.  R. 165.

Ferguson also had hepatitis C.[6]  R. 161.  She also experienced flu-like symptoms, including fatigue, of an unspecified etiology.  *Id*.

_____

between individuals.  *See* WEBMD, *Blood Sugar Levels and Diabetes*, http://www.webmd.com/hw/health_guide_atoz/aa135726.asp?navbar=tm7019#uf6923 (last visited August 31, 2006).  Ferguson testified that for her, 170 to 200 "is way out of control." R. 162.

[4]        "A classical term for any disorder affecting any segment of the nervous system." It is frequently associated with diabetes. STEDMAN'S MEDICAL DICTIONARY 1204 (26th ed. 1995) (hereinafter STEDMAN'S).

[5]        In her request for reconsideration, dated June 17, 2003, Ferguson indicated that she experienced migraine headaches "nearly every day."  R. 80.  Similarly, in post-hearing medical records submitted by Dr. Chebly, Ferguson reported "still having headaches nearly every day."  R. 8.

[6]        Hepatitis C is a liver disease caused by a viral infection.  It can lead to cirrhosis of the liver, liver failure, and has been linked to liver cancer.  Symptoms include fatigue, joint pain, belly pain, itchy skin, sore muscles, dark urine, and jaundice.  *See* WEBMD.COM, *Hepatitis C*, http://www.webmd.com/hw/hepatitus_c/hw144586.asp (last visited August 31, 2006).

In her request for reconsideration, Ferguson indicated that she experienced nausea, chills, cramps, diarrhea, lightheadedness, eczema, acid reflux disease, and hot flashes. R. 80.

Ferguson took various pain medications, including Advil (ibuprofen), Fioricet,[7] and Ultracet[8] as needed, and a low dose of aspirin daily. R. 81. She stated that the medications never totally relieved her pain. *Id*.

In an average day, Ferguson would get up, check her blood sugar, eat breakfast, take her medications, and try to do housework. Because she often felt nauseated, she would spend time in the bathroom until lunchtime, at which point she would eat lunch, take another dosage of medications, and then return to the bathroom. After getting the mail in the afternoon, she would take a nap, and then have a snack to maintain her blood sugar level. In the late afternoon, she would watch television and water the plants, and then have dinner with the friend with whom she lived. She typically retired around 11:00 p.m., but had trouble sleeping through the night. R. 163-64.

She often tried to do housework, but was easily tired. R. 165. She stopped doing laundry after once forgetting the laundry in the machine. *Id.* Her friend drove her to the grocery store, and helped her choose and carry groceries. R. 164.

---

[7] Fioricet is a brand name for an acetaminophen and butalbital (a barbiturate) combination used in the treatment of headaches. MEDLINE PLUS, *Butalbital and Acetaminophen (Systemic)*, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202102.html (last visited August 31, 2006).

[8] Ultracet is the brand name for a combination of tramadol and acetaminophen, and is used in the treatment of pain. MEDLINE PLUS, *Tramadol and Acetaminophen (Systemic)*, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/500321.html (last visited August 31, 2006).

Ferguson estimated that she could stand for ten to fifteen minutes before needing to sit.  She also estimated that she could only sit for about ten to fifteen minutes before she had back pain that radiated into her left leg.  R. 165-66.  She estimated she could walk the length of two grocery store aisles before she would need to stop and rest.  She estimated that she could comfortably lift a pitcher of tea.  She could shower and dress herself. R. 166.

B.     Medical Records.

Records from the Lakeland Eye Clinic dated October 8, 2001, indicate that Ferguson was seen for problems with mucous build up and decreased visual acuity at a distance. The diagnosis was glaucoma.  R. 94.

In July 2002, Ferguson was seen after two episodes where she lost sight in her eyes for a few seconds.  R. 96.  During one such episode, she lost her balance.  R. 96.  The initial assessment was amaurosis OS.[9]  R. 96.  On July 24, 2002, she was admitted to the hospital for this condition and underwent various tests.  R.  141, 144.

Luis E. Baltodano, M.D., examined Ferguson after her release and observed that the likely basis for the vision loss was ocular migraines.  R. 144.  He reviewed her symptoms, including diabetes, which he observed was well controlled, diarrhea, and hepatitis C.  R. 144-45.

In September 2002, Ferguson was seen by Francisco J. Chebly, M.D., to follow up on the hospital visit.  Ferguson reported that her migraines were less frequent and less

---

[9]     Amaurosis fugax refers to a loss of vision in one eye caused by temporary lack of blood flow to the retina. MEDLINE PLUS, *Amaurosis Fugax,* http://www.nlm.nih.gov/medlineplus/ency/article/000784.htm (last visited August 31, 2006).

severe.  Her blood sugar was very well controlled.  R. 141.  Her past medical history included gastroesophageal reflux disease,[10] eczema, asthma, glaucoma, and hemorrhoids.  R. 141.   Dr. Chelby's records reflect that Ferguson's past surgical history included a hysterectomy, breast surgery, and back surgery.  R. 141.

Dr. Chebly continued Ferguson on Glucophage and her medications for migraines, eczema, asthma, and glaucoma.  Because of her hepatitis C, Dr. Chebly referred her to a gastroenterologist for evaluation of her liver.  He observed that her abdominal discomfort, diarrhea, and nausea could be secondary to the use of Glucophage and Plavix.[11]  R. 142.

Dr. Chebly again evaluated Ferguson in October 2002.  She reported feeling tired, having diarrhea, and experiencing nausea.  Dr. Chebly noted that Ferguson was 5'11" tall and weighed 260 pounds.  R.  139.  Dr. Chebly's evaluation in October 2002 was substantially similar to the September 2002 evaluation, but he stated that he would hold off on the referral to gastroenterology "because of [an] insurance problem."  R. 139-40.

In November 2002, Daniel C. Traviesa, M.D., examined Ferguson for complaints of tingling in her feet, which had become worse after starting Glucophage.  On sensory examination, Dr. Traviesa observed "stocking-glove type loss to pinprick and vibratory

---

[10]    Gastroesophageal reflux disease, or GERD, is a more serious version of heartburn.  WEBMD.COM, *Your Guide to Heartburn*, http://www.webmd.com/content/article/45/1815_50327 (last visited August 31, 2006).

[11]    Plavix is the brand name for clopidogrel, which is used in the prevention of blood clots.  MEDLINE PLUS, *Clopidogrel*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601040.html (last visited August 31, 2006).

threshold elevation in the toes." He diagnosed diabetic polyneuropathy.[12] Dr. Traviesa observed that Ferguson "had a remarkable improvement in her headache pattern now with control of her sugar" and with the introduction of the medications verapamil[13] and Topamax.[14] He stopped the use of Plavix to address Ferguson's diarrhea. R. 137-38.

In December 2002, Ferguson told Dr. Chebly that she felt "okay," although she still had occasional nausea. Dr. Chebly noted that Ferguson's diarrhea had improved, her blood sugars were better controlled, and that she had only occasional nausea. Her headaches recurred after she was tapered off of Topamax, so Dr. Chebly reinstated that medication. R. 135-36.

Records from the Lakeland Eye Clinic between July and December 2002 indicate occasional instances of blurred vision. R. 91-93, 95.

In January 2003, Dr. Chebly submitted a letter stating that Ferguson "is not able to work because of her underlying medical problems, and needs to be on . . . medications for the rest of her life." R. 83.

In March 2003, Ferguson was seen by James D. Kinsey, D.C., a chiropractor, for

---

[12]    Diabetic polyneuropathy is a type of neuropathy commonly associated with diabetes and refers to nerve damage caused by high blood sugar levels. *See* MEDLINE PLUS, *Diabetic neuropathy*, http://www.nlm.nih.gov/medlineplus/ency/article/000693.htm (last visited August 31, 2006).

[13]    Verapamil is used to treat irregular heartbeats and high blood pressure, and is also occasionally prescribed for migraine prevention. MEDLINE PLUS, *Verapamil*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a684030.html (last visited August 31, 2006).

[14]    Topamax is the brand name for topiramate, which is used in the treatment of epilepsy and migraine headaches. MEDLINE PLUS, *Topiramate (Systemic)*, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/203085.html (last visited August 31, 2006).

low back, shoulder, and neck pain.  R. 124-30.  She indicated that she had pain

constantly, that the pain was sharp and shooting, and did not change.  She ranked her

pain as eight on a ten-point scale and stated that pain interfered with her normal work

quite a bit.  R. 129.

Dr. Kinsey observed that Ferguson was 5'11" and weighed 270 pounds.   He

observed that foraminal compression,[15] shoulder depressor, and Soto-Hall's sign[16] were

all positive for pain.  Ferguson's cervical range of motion was limited, she was tender to

palpation, and had a spasm in the area of the cervical spine. The diagnoses were

cervicalgia,[17] thoracic pain, and myofasciitis.[18] R. 124-25.

In April 2003, Ferguson was seen by Shanti Singh, M.D., at the request of SSA.

R. 101-03.  Dr. Singh observed that Ferguson had been diagnosed with type II diabetes

in July 2002, and that she had been diagnosed with hepatitis C.  Ferguson also

---

[15]     "A 'foraminal compression test of Spurling' is done to diagnose cervical radiculopathy. For this test, you will bend your head forward and to the sides while the health care provider provides slight downward pressure to the top of the head. Increased pain or numbness during this test is usually indicative of cervical radiculopathy." Cervical radiculopathy is also known as slipped disk. MEDLINE PLUS, *Herniated nucleus pulposus (slipped disk)*, http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited August 31, 2006).

[16]     Soto-Hall sign refers to a test performed "with the patient lying supine, on flexion of the spine beginning at the neck and going downward, pain will be felt at the site of the lesion in back abnormalities." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, *Sign–Soto-Hall*, *available at* http://www.mercksource.com/pp/us/cns/cns_hl_dorlands. jspzQzpgzEzzSzppdocszSzuszSzcommonzSzdorlandszSzdorlandzSzdmd_s_11zPzhtm#1 2737182 (last visited August 31, 2006).

[17]     Neck pain that does not radiate outwards.  WWW.SPORTSINJURYCLINIC.NET, *Pain in the neck (cervicalgia)*, http://www.sportsinjuryclinic.net/cybertherapist/ back/upperbackneck/neckpain.htm (last visited August 31, 2006).

[18]     A muscle disease that results in muscle pain. STEDMAN'S at 1168, 1171.

complained of chronic migraines, asthma, hemorrhoids, glaucoma, GERD, and eczema. R. 101.  Dr. Singh noted that Ferguson was 5'9" and weighed 266 pounds, which was obese.  R. 102.

Dr. Singh observed that Ferguson had "had a hysterectomy, birth surgery and a surgery on her back."  R. 101.

Dr. Singh observed that the acute loss of vision had resolved.  R. 101.  Dr. Singh also observed that Ferguson's blood sugar level and migraines were well controlled with medication, and that she had been referred to a gastroenterologist for follow up on her hepatitis C.  R. 102.  Dr. Singh observed that Ferguson was alert and oriented, that she ambulated without use of a cane, and that she had full range of motion in all joints.  R. 102.  Her motor strength was 5/5 in both upper and lower extremities. R. 103.  A sensory examination was normal.  R. 103.

Based on these observations, Dr. Singh opined that "Ms. Ferguson complains of multiple somatic complaints which do[] not match her physical examination.  She complains of chronic nausea, vomiting and abdominal cramping which may be secondary to Glucophage . . . ."  He opined that Ferguson may benefit from Neurontin[19] to address the burning sensations she experienced in her lower extremities.  He observed no symptoms associated with hepatitis C.  R. 103. Dr. Singh opined "[t]he patient on physical examination would have no problem holding a regular eight hour work day job." *Id*.

---

[19]     Neurontin is the brand name of gabapentin, which is used in the treatment of epilepsy, diabetic neuropathy, and hot flashes.  MEDLINE PLUS, *Gabapentin*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a694007.html (last visited August 31, 2006).

In June 2003, Ferguson was seen by Dr. Chebly for numbness in her feet and low

back pain.  Straight leg raising tests were positive in both legs.[20]  Ferguson reported no

headaches, and well controlled blood sugar.  R. 134.  Dr. Chebly observed that

Ferguson's lower back pain could be secondary to discogenic disease, and gave her

trials of Zanaflex[21] and Vioxx.[22]  *Id*.

In July 2003, Ferguson was seen for imaging of her back at Dr. Kinsey's request.

Richard R. Six, M.D., observed moderate degenerative spurring at the C5-6 and C6-7

vertebrae, which lead him to diagnose lower cervical degenerative spondylosis[23] and mild

scoliosis.  R. 131.

In December 2003, Dr. Chebly wrote a letter in which he opined that Ferguson

"suffers from Type 2 diabetes, hepatitis C, migraine headaches that are debilitating,

chronic eczema, glaucoma, asthma, peripheral neuropathy and chronic back pain. . . .

---

[20]     "'The simple straight-leg raising test is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'" *Menezes v. Apfel*, No. CIV. 99-168-B, 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

[21]     Zanaflex is the brand name of tizanidine, and is a muscle relaxant.  MEDLINE PLUS, *Tizanidine*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601121.html (last visited August 31, 2006).

[22]     Vioxx is the brand name of rofecoxib, a nonsteroidal anti-inflammatory medication used in the treatment of moderate pain.  It has been withdrawn from the market. MEDLINE PLUS, *Rofecoxib*, http://www.nlm.nih.gov/medlineplus/druginfo/ medmaster/a699046.html (last visited August 31, 2006).

[23]     "Cervical spondylosis is a disorder caused by abnormal wear on the cartilage and bones of the neck (cervical vertebrae) with degeneration and mineral deposits in the cushions between the vertebrae . . . ."  MEDLINE PLUS, *Cervical spondylosis*, http://www.nlm.nih.gov/medlineplus/ency/article/000436.htm (last visited August 31, 2006).

[She] has chronic back pain and chronic leg pain because of the neuropathy. She is unable to work because of her chronic pain syndrome and underlying medical problems that prevent her physically and mentally from working." R. 133.

In June 2004, Dr. Chebly wrote a letter in which he stated that Ferguson "is currently unable to work because of her severe underlying medical problems." R. 132, 154. He noted that Ferguson did not have money to buy medication. R. 132, 154. He reiterated this opinion in a letter written in September 2004. R. 153.

In May 2005, in a letter submitted to the Appeals Council, Dr. Chebly observed that Ferguson "suffers from chronic migraine headaches, hepatitis C, type 2 diabetes with neuropathy, gastroesophageal reflux disease, asthma, glaucoma, depression, [and] back pain. . . . She chronically suffers from being fatigued and tired which is related to her hepatitis C. She has also daily headaches related to her migraine and she always complains of low back pain. She is chronically depressed and every time she comes to see me for her visit she is always crying. She is also constantly complaining of leg pain." R. 7. Therefore, Dr. Chebly stated, "I believe that the due to the above problems the patient is unable to perform any regular job except activit[ies] of daily living and I do believe, based on her complaints that are chronic and constant, that she is permanently disabled." *Id.*

C.    *Reviewing Professionals.*

On April 24, 2003, a person whose signature is illegible prepared a Physical Residual Functional Capacity Assessment based on a review of Ferguson's medical records. R. 104-11. The reviewer opined that Ferguson could occasionally lift up to fifty

pounds, frequently lift up to twenty-five pounds, and sit, stand or walk about six hours in an eight-hour day.  R. 104-11.  The reviewer opined that Ferguson would have no limitations on her ability to push or pull.  R. 105.  The reviewer based this opinion on the fact that records "indicate all problems are under control" and that Ferguson did not require assistive devices to ambulate, had full range of motion in all joints, and motor strength was normal. *Id.*  The reviewer concluded Ferguson had no postural, manipulative, visual, communicative, or environmental limitations.  R. 106-08.

On August 14, 2003, Violet A. Stone, M.D., completed another Physical Residual Functional Capacity Assessment based on a review of Ferguson's medical records.  R. 112-19.  Dr. Stone reached the same conclusions about Ferguson's functional ability as the previous reviewer.  R. 113.  She also concluded that the "[s]everity of symptoms [is] not supported by objective findings."  R. 117.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(A).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395

F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

**V.   ANALYSIS.**

Ferguson asserts two grounds supporting reversal.  First, that the ALJ's RFC determination was inconsistent with the opinion of Ferguson's treating physician and otherwise was not supported by substantial evidence.  Second, that the ALJ improperly applied the "pain standard" in evaluating Ferguson's subjective complaints of pain, and therefore improperly discredited Ferguson's subjective testimony.

    *A.    Consideration of Dr. Chebly's Opinion.*

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary."  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)).  Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records."  *Id.* (internal citations omitted).  The ALJ must articulate the reasons for giving less weight to the opinion of a treating physician.  *Id.*  However, the ultimate determination of whether a claimant qualifies for disability under the Act is made by the SSA.  20 C.F.R. § 416.927(e)(1).

Here, the ALJ concluded that Dr. Chebly's opinion that Ferguson was totally disabled because of her migraine headache, diabetes, hepatitis C, back pain, and other conditions, was inconsistent with his own medical records, for the following reasons:

> Dr. Chebly states the claimant has severe migraine headaches.  Yet, his progress notes show she was having no more headaches (Ex 6F, pg 3) [R. 134].  In fact, his progress notes show on the last few visits that she was feeling okay.  It has been noted that her blood sugar is very well controlled. . . . She complains of chronic back pain.  She has a normal gait, station, and coordination and muscle strength.  Moreover, Dr.

> Singh's examination showed her somatic complaints did not
> match her physical examination and she would have no
> problem holding a regular eight hour workday job."

R. 21.

The ALJ's findings regarding Dr. Chebly's records are supported by evidence in the record. Ferguson stated on June 10, 2003, that she was having "[n]o more headaches," and that she felt "okay." R. 134. Dr. Chebly observed that Ferguson's "[b]lood sugar is very well controlled." *Id.* She complained of low back pain, for which Vicodin, a strong pain medication, gave her some relief. Dr. Chebly's records reflect that she had no motor or sensory deficits, although he did not opine on her gait, station, coordination or muscle strength. He did indicate that her complaints of pain were confirmed by a straight leg raising test, and expressed concern that the pain could be secondary to discogenic disease. He treated the pain with Vioxx, a medication used to treat moderate pain, and Zanaflex, a muscle relaxant.[24]

Subsequent to the June 2003 examination, Dr. Chebly wrote that he continued to treat Ferguson. He opined that her chronic leg pain was due to neuropathy. He invited the reader to inquire if further information was needed. R. 133. Dr. Chebly's reference to neuropathy is supported by the records of Dr. Traviesa, who opined in 2002 that Ferguson had diabetic polyneuropathy. Nevertheless, Dr. Traviesa noted that Ferguson's gait, station and coordination were normal. R. 138. Dr. Singh also found that

---

[24]    Ferguson presented other records from Dr. Chebly to the Appeals Council. She does not rely upon the evidence presented to the Appeals Council in her memorandum of law, and she does not appeal the decision of the Appeals Council denying review. Therefore, the court "will look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence." *Falge*, 150 F.3d at 1323.

Ferguson had full range of motion, that she walked well without an assistive device, and that her motor strength was intact.  R. 102-03.

Ferguson contends that the ALJ erred in giving weight to Dr. Singh's opinion, because Dr. Singh reported that Ferguson had birth surgery, hysterectomy, and back surgery, all of which Ferguson testified she did not have.  While it is unclear what Dr. Singh referred to as "birth surgery," Dr. Chebly's records also reflect that that Ferguson had a history of hysterectomy, breast surgery, and back surgery.  R. 141.  If this information was erroneous, it was nevertheless consistent with the records of Ferguson's treating physician and does not support the argument that Dr. Singh's opinion was not credible.

Because the ALJ articulated specific reasons for giving less weight to the opinion of Dr. Chebly, a treating physician, and these reasons are supported by substantial evidence in the record, the ALJ did not err in refusing to find Ferguson disabled based on Dr. Chebly's letters.

B.    *Consideration of Ferguson's Residual Functional Capacity.*

RFC "is what an individual can still do despite his or her limitations." Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p (1996).  It takes into account "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." *Id*. RFC does not  represent "the least an individual can do despite his or her limitations or restrictions, but the most." *Id.*

Because a proper determination of RFC takes into account the extent to which pain and other symptoms affect a claimant's ability to work, it is appropriate to consider the claimant's testimony regarding pain and other subjective symptoms. "[I]n certain situations, pain alone can be disabling . . . ." *Foote*, 67 F.3d at 1561. In other situations, pain may be a nonexertional limitation that must be considered in determining RFC. *Id*. at 1559.

To establish disability based on testimony of pain and other symptoms, the ALJ must apply the pain standard announced by the United States Court of Appeals for the Eleventh Circuit. "The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Foote*, 67 F.3d at 1560 (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)). If the Commissioner discredits the claimant's subjective testimony, she "must articulate explicit and adequate reasons for doing so." *Id*.3d at 1561-62.

In this case, the ALJ determined that there were underlying medical conditions that could give rise to the pain and other subjective symptoms about which Ferguson complained. He determined, however, that these conditions did not cause the extent of the functional limitations about which Ferguson complained. In support of this conclusion, the ALJ relied upon Ferguson's ability to engage in activities of daily living and "no significant reports of side effects from medication." R. 21.

These findings are not supported by substantial evidence in the record. While Ferguson testified that she could engage in activities of daily living, she also testified

about the problems she experienced performing those activities – specifically, that she could not walk for more than two aisles in a grocery store without needing to rest, and that she tired easily when performing household chores.  Fatigue is a nonexertional impairment that is consistent with Ferguson's hepatitis C.  *See Geiger v. Apfel*, No. 6:99-cv-12-Orl-18B, 2000 WL 381920, at *5 (M.D. Fla. Feb. 9, 2000).  Thus, these activities of daily living do not support the ALJ's determination that Ferguson could perform work at a medium level of exertion for a sustained period.  *See Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989).

Moreover, it appears that the ALJ based his determination that Ferguson could stand, walk, and sit six hours in an eight-hour work day, and lift up to fifty pounds, on the opinions of the state agency reviewing professionals who cited no medical evidence in support of their conclusions on these points.  While the ALJ cited Dr. Singh's report as supportive of these conclusions, Dr. Singh did not address Ferguson's exertional limitations.

The ALJ also failed to consider the nonexertional limitations arising from Ferguson's impairments.  The medical records consistently reflect that Ferguson suffered chronic side effects of medication, including nausea and diarrhea, as well as fatigue as discussed above.  Dr. Chelby and Dr. Singh both opined that these side effects were related to Glucophage, a medication that Ferguson required to treat her diabetes.  Side effects from medication can create nonexertional impairments that an ALJ should consider in assessing a clamant's RFC. *See* 20 C.F.R. § 416.929(c)(3)(iv); *see also Rambo v. Heckler*, 728 F.2d 1583 (11th Cir. 1984)(finding chronic diarrhea to be a nonexertional impairment).

Accordingly, the ALJ's RFC determination was not supported by substantial evidence in the record and failed adequately to address the evidence of nonexertional limitations arising from Ferguson's impairments.

C.      *Award of Benefits or Remand.*

Ferguson requests that the Court order the Commissioner to pay her disability benefits.  A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt."  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997).  Here, the record does not establish disability without any doubt.  Rather, remand is required to permit the Commissioner to assess, based on competent evidence, the maximum amount Ferguson can lift, and the maximum duration Ferguson can stand, walk, and sit. Additionally, the Commissioner must assess the effect of the functional limitations arising from Ferguson's documented pain.

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the

Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42

U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a

judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on August 31, 2006.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties